May it please the Court. Good morning, Honorable Chief Judge, Honorable Judges, and esteemed colleagues. Good morning. We start with the first issue and the understanding that warrantless entries into a home are presumptively unreasonable, absent exigent circumstances. In this case, a protective sweep was conducted after the arrest of an individual that took place outside of a residence. The government maintains that the protective sweep was permissible, was justified. I will demonstrate that they have not met their burden of proof to justify this warrantless entry into the home. The facts of this case are that U.S. Marshals along with city police and constables in an outlying county were charged with the arrest of a state parole violator, a defendant in this case, and had an arrest warrant only. They investigated the circumstances surrounding the particular residence where they were to go execute this warrant. They received information from the defendant's wife that he was in fact staying at that particular residence. It's important to note that the residence was owned not by the defendant but by the defendant's mother. So approximately nine to ten officers approached the residence. This is during the middle of the day. Did the police know who owned that house? I'm sorry? The trailer. Did the police know who owned the trailer? My understanding is that they did. That the defendant's wife specifically told the marshal that there was a residence owned by the defendant's mother. So I believe they had that information. So give me the scene then. So the police come and knock on the door to serve the warrant for his arrest and he comes to the door about a minute later according to what I read. Correct. And so when does his wife get on the scene? The wife was never at the scene. He's the only individual. I thought you said she told him. She did but at a different location in a different city told U.S. Marshals this is where I believe he is. This is his mother's address. So with that information they go. So to pick up where you left off, they announce their presence. It takes him approximately a minute to come out of the house. He does come out of the house. The door shuts behind him. They take him to the ground. They arrest him without incident. Now, it's what happens thereafter that there is some dispute and the defendant argues there was no exigent circumstances at that point that any exigency terminated upon the arrest. That's not quite the rule for a sweep in connection with an arrest, is it? Well, it's not necessarily the rule but what I was able to at the suppression hearing, what I was able to elicit from the officers a number of important things. Number one, they had no information that there was anybody else inside that residence. There was no movement from the windows. They just didn't know whether somebody was in there or not in there. There was no evidence. That's correct. But more importantly, at that point, after the arrest was effected, I asked the Deputy Marshal, Deputy Marshal Lujan in this case, whether or not he had the ability to obtain a search warrant to enter that residence. And he said that he did and that nothing prevented him from entering into that residence. I'm sorry, nothing prevented him from going to a local judge to get a warrant. Doesn't a protective sweep take – occur time-wise instantly following an arrest? That's the purpose of a protective sweep. Well, I agree, Your Honor, but I would state or maintain that there's got to be some specific articulable facts that these officers are drawing from. And they don't in this case that prompts them. How about their experience and their knowledge of cases in which a second or third party shoots through the window of a house or trailer or does something like that? This is a small residence. They've got him to come out. They don't know if anybody else is in there or not. That's correct, Your Honor. That's correct. But again, what I'd like to do is draw a contrast between what the district court relied upon, in which case it relied upon in denying the motion to suppress. In that case, it was United States v. Maldonado, a case that this court decided, I believe, in 2008. And in that case, I think it's strikingly different from this case. We're talking about a warrantless entry that was justified, but the facts, an arrest that took place outside the residence where officers conduct a protective sweep after the arrest. They have, in that case, this is a case where it's a drug sting that's set up, and it's a fast-moving situation. Yes, it is. Yes, sir. I mean, the case law regarding exigent circumstances is what it is. So first off, do you contest that this was an exigent circumstances case? And if so, that or do you accept it may have been exigent circumstances, but the officers still didn't follow the law? You follow me? I mean, do you take a view or did you take a view at the suppression hearing that this is not an exigent circumstances case? I did. Okay. That was your main thrust, right? Yeah. Well, that was the issue. I don't mean the only one, but I mean— That was one of the issues of being contested, yes, Your Honor. All right. And so the principal focal point at the suppression hearing concerning that was what? Your cross-examination of the officers or what? Yes, I tried to elicit what prompted them or what motivated or what they could point to specifically that gave them some suspicion, some specific fact or some inference that was drawn from those facts to prompt them to go in to enter that residence. And so, again, it's my contention. And the government's response is, well, he's a known gang member. He is a violent person. He has a lengthy criminal history. My response to that is that all of that was terminated. All those factors that they believed were important were terminated once they effectuated that arrest without incident. And so, again, they could have secured a warrant. They could have—number two, they could have asked the owner of the residence, his mother, for permission to enter that residence. Those are two things that I think stand out or are important in this case. My second issue deals with the extent of the protective sweep once they enter the residence. And so, again, the notion is this is supposed to be a limited cursory search of the residence once they're in. I believe they exceeded that scope. As the court knows, they proceeded into the residence and looked under a mattress. Further, they looked under—opened up a box spring that was—unbeknownst to them, was hollowed out. And ultimately, they obtain and see the firearm and ammunition that they discover, and they use the basis for the prosecution of this defendant. Well, you know, the heartland in this kind of area is that wide as far as cases go. So in this case, they say it's a mattress, et cetera. So what's the best case you rely on to prevail on them exceeding the search? I mean, we know that there are plenty of cases in which officers have looked in closets. They've looked under beds and done that. So we know that's the lay of the land. So what's the best case you have for your circumstances here that either the mattress look was a pretext or, you know, the nature of the mattress wasn't such that anybody could have been in it or what? Yes, Your Honor. The case that I rely upon is a case that I cite in my brief, and that's the United States v. Ford. It's a D.C. Circuit case, 1995. In that case, the court examined United States v. Bowie and the protective sweep. The court ultimately reasoned that once in the bedroom, well, they – Let me ask the question more succinctly. Sure. What's your best Fifth Circuit case? I don't have a Fifth Circuit case to support the notion, that specific notion that looking under a mattress is permissible and, well, further, looking under a box spring. So I would rely upon, again, the Ford case. And so the point that I want to make with regard to the Ford case is that the court notes that the officers could have secured a warrant in that case, number one, and number two, could ask the owner for consent. Were there photos in the record of the box spring, et cetera, at the suppression hearing? Did you make an issue that the nature of the box spring was not such that anybody reasonably could have been underneath there? Or I'm just trying to get the full sense of what you developed in the motion to suppress because your appeal, quite naturally, is from that adverse ruling, right? That's correct, Your Honor. There were some photos in the motion, but those photos were not introduced into evidence at the actual hearing. And so there was some – Because they were false, isn't it? Well, there was some contention about that. That's the government's position. I did have a witness ready and willing to testify as to the photos I submitted, but, however, that witness did not ultimately testify. You don't have much time left, and a closer issue, in my opinion, is the third sentencing level reduction. Maybe you ought to touch on that. Sure. Yes, Your Honor. I believe that the court, the district court, procedurally erred by not giving, now on the defendant, the third point in this particular case. Again, this defendant timely pled guilty almost immediately after the denial of suppression. The motion to suppress the defendant indicated to the court that he accepted responsibility, that he would plead guilty. The government did not expend its resources. As 3E1.1 contemplates, it has nothing to do with whether or not a pretrial motion or any other type of motion is litigated. It has everything to do with or contemplates the preparation for trial and the government having to expend its resources to litigate such. There's a big difference between preparation for a motion to suppress hearing, which in this case took about an hour and a half to conduct, versus preparation for trial, which, as you know, is one to two days preparation. How does the amendment to the 3E1B affect your case? You're talking about Section B? Well, again, there's nothing in there in the amendment that talks about any type of motion. So you're relying on the difference between a motion to suppress and trial? Yes. And the thrust of it at Section A or Subsection A is that did the defendant accept responsibility? And he did. And number two, did he timely notify the government? And he did. There was never any issue as to acceptance of responsibility. I mean, the argument is that they're justified in denying you the benefit of the reduction because your argument, your motion to suppress, was filed in bad faith. Well, that's just not the case. It was filed in good faith. There was never any testimony as to whether or not it was an illegitimate motion or the contents of the motion were legitimate or not. It's just the government's position. Did the district court have anything to say about that? They did not. They did not. All right. Anything further? That's all I have to say. Okay. You've reserved your revolt time. Thank you. Thank you. All right. Ms. Hickens? May it please the court. Good morning. Jessica Hickens for the United States. It's wonderful to be here with you today. As you know, the defendant in this case has raised three points on his appeal. The first two have to do with the motion to suppress. The first is whether the protective sweep was valid, and the second is if those officers exceeded the sweep. The third point, obviously, as you mentioned earlier, Judge, was the third point for acceptance of responsibility, which is tied to the litigating and filing of the motion to suppress. As you know, the standard for the motion to suppress is that the evidence is viewed in the light most favorable to the prevailing party. Let's take the last point first. All right. Because you're the government. I mean, what is this assuming arguendo, bad faith by the lawyer? I mean, what's up with taking that out on the defendant if it otherwise fits typically, you know, kind of the pattern? I don't know any more than what we read here. So I'm just, you know, we've all read a lot, but I don't remember too many where there's this either notion of bad faith by the motion to suppress, unless it's come up where it was patently frivolous. You know, I mean, just no shred of anything, you know, just frivolous. But that tend to pertain more to a sanction on the lawyer or whatever, not so much whether the defendant gets it, but here where there's no allegation, you know, it's just frivolous. There's no arguments to be made. What's the strand of bad faith here, and then how does that then relate to the acceptance? And then if the district court doesn't comment on it at all, so what are we supposed to, you know, glean from that? Okay. My response is twofold in that we start with the actual written motion to suppress that was submitted, and there were factual allegations about how the evidence in this case was taken by officers. The falsehood that was given was that when the officers reached up and opened up the mattress that there was a locking mechanism on the wooden container. And secondly, the second allegation was that somehow officers used an instrument to pry that open. Now, obviously, that's going to change the theory of the case in terms of the protective sweep, which is based on a person being there, and they're being harmed to the officer. That information about the lock was provided, I suppose, by the defendant. He's the one that knew it. I believe that's the case. I believe the defense— Well, if there is bad faith, the defendant would be charged with it. Sure. If it's false information, if it's false. Yes. And I guess to go further into that, why the government did not recommend the acceptance of responsibility was that the government was operating under the defendant's theory. And so they read that motion to suppress, we replied to it, and then we called witnesses to litigate that issue. So at the time of the motion to suppress hearing, the government is still negating that to show the judge why the search was reasonable. He called two witnesses, the trial prosecutor in this case called Officer Thomas and Agent Sutton to both give testimony about the mattress, the fact that there was no locking mechanism. There was specific testimony about maybe a hinge being broken and damaged. They all had to provide that testimony. Had the defendant not made that allegation, the government would not have needed that testimony and that third witness in Agent Sutton because that was really the whole crux of his testimony in the hearing. Well, assuming that carries, what do you do with the language from Castillo? It says, government being able to avoid preparing for trial. The commentary makes no reference to the government preparing for a sentencing hearing. That is true. And in that case, I think the difference is that the court was concerned that the sentencing issue having to do with the facts was a viable issue and should be litigated. Where in this case, everyone has admitted this was a falsehood. Even the defense attorney on the record told the court, withdrew his witness, withdrew the photographs and the testimony knowing, but that wasn't until the end of the suppression hearing. So the government had already gone through the entire length of the motion to suppress. And to the defendant's point— This is acceptance of responsibility. Is that the— Yes, Your Honor. It's the third point. And if the defendant is chargeable with the falseness of the lock, claiming that it was concealed, I mean, doesn't that indicate that he is not accepting his responsibility if he is making up stories? That's a very interesting point, Judge Dawley. And I went back and looked at the language that even granted him the first two points and wonder if there was an argument to be made there. But the government did go ahead and give him the first two points and then withheld the third because of this specific issue and what they had to do for this motion to suppress hearing. And we're talking about a different lawyer than who's here today? No. Mr. Cervantes was the trial and appellate counsel. All right. So the statement that you just said that the defense attorney admitted on the record, say that again. He later, at the end of the hearing, he withdrew his witness. And when the judge asked about the photographs, the prosecutor said that he had seen the photographs. And then when the judge questioned the defense attorney, he seemed to admit he was not going to admit them and he did not think it was the correct course of action, which was the proper thing. And he did also make sure that the judge was aware he had not admitted those photographs into evidence, which as far as I can tell is correct. And I think the commentary also on the third point is very telling in terms of it's not a matter of right. The defendant is entitled to it. The government is in the best position to judge whether he's entitled to it, and the district court is entitled to great deference in that matter. And I would liken this case to the Fifth Circuit case, Escobedo-Torres, where the defendant gave false testimony in a motion to suppress hearing. A little bit different, but the closest I can find factually. And the court upheld that and said because the government had to prepare, we had to go prepare for something that you knew wasn't true, then we were able to withhold that third point. And that's 146-736. If you don't have any other questions on the third point, we can dive into the protective sweep. A few things that were mentioned by the defense attorney was that the government agents could have asked his mother for permission to search the property. The record shows that at the time officers were surveying it and had found out about the property, the mother was not cooperative. In fact, she would not tell officers where her son was. They later learned from a girlfriend or wife that he might be on the property. So they did their own surveillance, saw the defendant coming in and out of that trailer, and determined he was living there at that time. And with regard to the big question, which seems to be why the officers didn't get a search warrant, I have several thoughts on that. The first is sort of commonsensical because it just wouldn't have made sense. These officers were not an investigative unit. They were not the FBI. They were not the DEA. There was no ongoing investigation for their purposes. They are a specialized fugitive apprehension team. The defendant's case was referred to them, and their only mission was to go in, arrest him, and not get shot in the process. Well, I mean, what the problem would cause, what would have been the probable cause for a search warrant to begin with, other than a sweep? And you don't need a search warrant for a sweep. So that seems to be a— Exactly, Judge Schawley. And I think the point is they probably didn't have probable cause, and that's okay. They didn't need it. They were not there for the trailer. They were not there to look for evidence. They were going in to grab the defendant. All the information they knew about him showed he was violent in the past. He was presently violent. He had just two weeks earlier been impersonating a police officer with a weapon. They were going in to grab him and to be safe. They had no thoughts. There's nothing in the record that indicates they were looking for evidence. So they only needed reasonable suspicion for that protective sweep, which only took 40 seconds. As soon as they found the evidence, which they had a right to because they were there lawfully, they saw it in plain view, they called the ATF, who then took over. What was the allegation of the breach of his supervised release of parole or whatever it was? He had an assault case, I believe, in the state that was pending. And at the time, he actually had seven arrest warrants. So there was a lot. Seven arrest warrants were outstanding for him at the time that this arrest was made? Yes. The seven cases were referred to Gulf Course. Were they seven different cases or just seven cases that arise out of a single episode? Seven different cases. Three cases were for impersonating a police officer. Three cases had to do with the bond bailsman case that's discussed more in the sentencing hearing. And the seventh was a parole violation. As you know, the protective sweep, we look at the totality of the circumstances. We get to look at everything the officers did that day to determine if what they did was appropriate on that day. And I think this court's ruling in Maldonado helps us in terms of giving guidance on when an officer can go in and when they cannot. And further, the Garcia-Lopez case gives us further guidance about looking under the mattress, which obviously is a very unique situation. In this case, it's very close to that case in terms of us having the valid arrest warrant, going in for the only reason for the protective sweep, and then having officers only look in areas where they believe people can be hidden. Both Marshall Lujan and Officer Tamas testified to that. They both, interestingly enough, have 18 years of law enforcement experience. They both talked about their experience in arresting people, all the different places that people hide. And it shed a lot of light and gave the judge a lot of understanding about what they were actually doing that day with this violent offender and looking in just the places where people could be hiding, knowing that he had weapons, he was a gang member, he has 21 criminal convictions, family members that were not cooperative, and close gang ties. How old is this defendant? I'm sorry? How old is this defendant? I believe he's about 40, 38 or 40. The PSR indicated he committed his first crime at age 18 and had committed 21 convictions in 20 years. 21 convictions? In 20 years. He had 21 convictions in 20 years? In the past 20 years, yes. So going in, they knew he was a violent offender, and they were doing everything they could to protect themselves. The mattress is very interesting, but I think that the photos show, Government Exhibit 3 and 4, are very helpful. And I think the judge talked a lot about that, about how the photographs gave him a picture of the scene. In terms of the length, it was 18 inches by, I believe, 6 and 8 feet. And as you can see from the photographs, it was hollowed out, even though it had the shelf. And had the shelf not been there, a person could have been hiding there. This was a waterbed, right? I think that was in the other room, Judge. I think this one was actually, it's difficult to tell, but you can sort of see the mattress sitting on top of the wood. I think that waterbed was in the second bedroom. So this was a regular mattress? I believe so. But that's what the picture looks like to me. It looks like a mattress sitting on a makeshift, as you will, box spring, I suppose, that's hollowed out. But their testimony was very enlightening in terms of the way people use hollowed out containers. And the officers in Garcia Lopez, in which this case upheld a search under a mattress, is very similar in terms of people that go in and know where people are hiding. And so I don't think that there's been anything to show that that was unreasonable that was fleshed out in the motion to suppress hearing. Again, the defendant was the target, not the trailer. This was a specialized elite force going in to take him and be safe and get out. And I think the record reflects that these men, with their experience, did everything they could to perform their job that day in the best way possible. A reasonable view of the evidence supports the district court's ruling in that matter. If you don't have any further questions. I do. Oh, great. I want to get back to the acceptance of responsibility. Okay. If we rule the way you ask, how do we distinguish our ruling from Castillo? I think in Castillo, if I'm not mistaken, it wasn't such a blatant, fraudulent act by the defendant that put the government through many more hoops than necessary. And that's why I pointed you to Escobilla Torres' case, because I think that shows that extra step. When a defendant does something a little bit extra that makes our job harder, not just exercising rights, but putting a falsehood that we know is not true. But the amendment to 3E doesn't list suppression hearings, and Castillo makes that distinction. And I don't know how we can rectify ours. I understand your concern, and I believe when you talk about pretrial hearings that are sentencing matters and they're legal issues we're trying to figure out in the PSR, I don't think that is the equivalent of a trial. And that's the difference with the motion to suppress. Whether the government rested solely on the grounds of denying support for his additional reduction, that he had caused them to go to a hearing. Or was it because he didn't actually show acceptance of responsibility? I think it actually might be both. What's interesting is… Did they articulate one or the other? The trial prosecutor said the fraudulent testimony, I had to call these witnesses, we had to do an entire motion to suppress. But he did mention fraudulent testimony? He did. He said, I don't know if he used the term, Your Honor, but he did mention that we went through these hoops operating on one set of facts that were not the facts. So the government started out in this hearing with its position that the testimony supporting a locked case was false. That's correct. It wasn't something that was revealed to them at the end of the hearing. I don't actually know when it was revealed. I don't know that that's clear. I'm sort of taking inferences of what I believed happened. But you said, did the government make an argument during the course of the trial? No, not during the suppression hearing, only at the sentencing hearing. When did he enter a guilty plea? Was it after losing the suppression hearing? It was. And I think when you look at the case law, the defense attorney had talked about how this motion to suppress hearing was only an hour and a half, and that wouldn't be the length of a trial. But we all know there can be short trials, and here's the thing. If you look over that hearing record, if the government were going to try this case, there's not much more we would have needed. That would have been our trial. So in effect, we did present a mini-trial, and Fifth Circuit case law actually says you can deny it, the acceptance of responsibility, just on the filing and litigating of the motion. Have those cases decided after the amendment? Because the cases you cited in your brief were before. Are before. You're right, Your Honor, that is true. But we went a step further and said the reason we're doing it is because we had to, in effect, prepare for something that never happened. Agent Sutton didn't even need to be called. What did the judge articulate about the denial? I think he was concerned about what had happened. I don't know that it's completely clear that he did it just on the denial of the motion, but he recognized that the defendant didn't put forth any evidence or any testimony at that hearing. In fact, he didn't even cross-examine Agent Sutton once he gave the testimony that there was no locking mechanism. And so I think you can sort of read between the lines that that was concerning, and that was the government's position throughout the entire sentencing hearing. We are not moving for the third point due to this falsehood. But he was given the first two. Wait a minute now. I didn't understand that to be your argument to me. I thought you were saying that they did not raise the falsehood question. At the sentencing hearing. I apologize. They did not. Not the motion to suppress hearing. At the sentencing hearing. Oh, no. At the sentencing hearing, was the falsehood raised there? It was when the trial court asked the government if they were moving for the third point. The government responded and said no because of the falsehood, and we had to prepare for this trial. So they combined the falsehood and trial. Is that what you're telling me? Correct. Yes. Expressly. Yes. They said not trial, suppression hearing. Yes. But there is case law that says if the suppression hearing equates to the preparation time. So it's two quite different things. I mean, in other words, getting ready to go to trial on a legitimate and good faith motion to suppress. But if the government says we're denying them on the basis of the falsehood and the efforts that it took us to go to trial, that's two separate reasons as I would read it. Agreed, Your Honor. It is. And that's why this is a unique case. We're not saying that this is the way all cases should go. This is a very unique case, as you know, just from the facts alone. Very unique or just unique? I think it's very unique. You've got the matchers. You've got 21 convictions. Lots of interesting criminal things in this case. If you don't have any further questions, we would ask that you uphold the district court's ruling in this case. Thank you. All right. Mr. Cervantes, rebuttal. Yes, Your Honor. I'd like to respond primarily and first to this notion that it was a disingenuous motion or there's some falsehood being perpetrated. That's completely not the case. The photos that I submitted at the motion to suppress – Why did you withdraw your witness? The federal prosecutor threatened my client with perjury, potentially with perjury. That's without even hearing any testimony. So once that information is related to my witness and to my client, it tends to change what happens. And so this is an off-the-record discussion between me and the prosecutor as to whether or not those photos that I submitted were true or not. I intended in good faith and all to proceed with the hearing to call my witness and to prove that those photos, according to my client and my client's family – Did the government say, I'm going to threaten him with – I'm going to prosecute him for perjury irrespective of what he says? Or did the government say, if he gets on that witness stand and lies, I'm going to prosecute him for perjury? No, and there's a big difference. There was just – it would be the latter. The latter, that if he gets on there and lies, and you, knowing what you knew and what you didn't know, you gave your client some good advice, get off that witness stand. Right. And so that – again, there is no falsehood here. No proven falsehood. No proven falsehood. It's simply the government's belief, off the record. I never introduced those photos into evidence. But it's not teed up like a typical motion to suppress. I mean, something here is not rattling around. This is a little strange. I mean, the typical motion to suppress, you're going to go in and attack the government's position. Tooth and toenail, you lose, you plead guilty. But here, we've got photographs purportedly, and a position, and something about that's not right. And the government says, well, you know, this is not right. If you put this on, we're going to do that. We've got this drama around the motion to suppress, and that's not typical in the motion to suppress. She says, you, on the record, then withdraw. I'm not going to put this on because – so, I mean, that's different than a changed litigating position in the typical tee-up. So something about this is not squared up, Mr. Cervantes. I think it was a small issue as compared – small issues to whether or not there was a lock on that particular mattress box. And so the government was going to have to prepare for this motion here regardless. But you heard the government say they lined up their witnesses. They put on the agents, the people that they called was because of the way the motion to suppress was going to be teed up. They put on evidence toward the position that you articulated to be on, and then they say then you admitted on the record. It's been – it's about the lock. I mean – I did not admit on the record that there was a falsehood. Okay, so we're going to have to read the whole trial record, I guess, to figure out for ourselves. What I told the judge is simply that those were the photos that were supplied to me by the family, and I submitted it in my motion. That was it. That's the only – Then withdrew your witness. Then I withdrew the witness, yes, sir. But my response to Your Honor is that the government was going to have to call these witnesses regardless of it. Well, Mr. Van, I just have to tell you from my eyes, putting aside whether a basis for the non-acceptance is based on how much preparation the government has to do, it just sounds to me that based on the way this was teed up, you're hard-pressed to convince me that the district court abused its discretion not to grant this point just based on the scenario that you've outlined. Well, my argument to that is – the thrust of my argument is that he ultimately did accept responsibility. He timely pled guilty, and so that's, again, briefly – Well, it's still a discretionary call, isn't it? Yes, Your Honor. All right, so we're still talking about an abuse of discretion, aren't we? We are. So you lost. It's not the call you want, but given the scenario described, how does that amount to an abuse of discretion? Well, again, I think the government is trying to paint this as some falsehood, something being disingenuous. It's not – that was never the case. It wasn't proven. These government witnesses were going to have to show up to trial – I mean, sorry, to the hearing regardless. They were going to have to justify the warrantless entry, and so . . . Well, that's your position, and you're sticking to it. I got you. Right? Yes, Your Honor. All right. I think we have it. All right, Mr. Cervantes, you're court-appointed, and as with all the court-appointed lawyers we have, the court as a whole and this panel does appreciate you taking on these cases, both to try and to come here and argue, and without you and others, the system wouldn't work. So thank you very much. You're welcome. May I be excused? Yes. All right.